### SECURITIES AND EXCHANGE COMMISSION, Plaintiff,

**Securities Investor Protection Corporation, Petitioner,**

v.

### SECURITY PLANNERS LTD., INC.,

**and**

**Edward J. Hogan, Defendants.**

Civ. A. No. 71–656–M.

United States District Court, D. Massachusetts.

March 8, 1976.

Thomas F. Maffei, Choate, Hall & Stewart, Boston, Mass., for Trustee.

Kevin H. Bell, Washington, D. C., for SIPC.

Arnold Bloom, Mark J. Witkin, Boston, Mass., for Stephen Pappas, claimant.

## Memorandum and Orders

FRANK J. MURRAY, District Judge.

This case came on to be heard on the objections to two claims made under the Securities Investor Protection Act (Act), 15 U.S.C. §§ 78aaa et seq., one claim by Stephen Pappas, and the other by F. L. Putnam & Company, Inc. The objections to the claims were made by the trustee appointed by the court under 15 U.S.C. § 78eee(b)(3). Both claims depend upon construction of certain provisions of the Act.

### A. The Pappas Claim

Pappas, a former client of Security Planners Associates, Inc. (Planners), contends that he is entitled to $1365 as a customer whose net equity is protected under the Act. The facts with respect to the transaction between Pappas and Planners upon which Pappas' claim depends are as follows. In April 1970 an agent of Planners solicited Pappas in connection with the purchase of shares in Intergeneral Industries. Pappas declined to make such a purchase. Thereafter Pappas received notice from Planners that he had purchased 500 shares of Intergeneral with a settlement date of April 29, 1970. After initially refusing to pay for the shares, Pappas reached an agreement with Planners under which he agreed to pay for the shares and Planners agreed to sell him out of the stock immediately. Pappas paid Planners $1305 by check dated May 11, 1970. In June 1970 Pappas received a confirmation that the stock had been sold with a settlement date of June 23, 1970 and that he would receive $1365 from that sale. Throughout the summer of 1970 Pappas attempted to learn from Planners when he would receive payment for the sale but received no satisfactory answer. Finally by letter dated September 18, 1970 Pappas received notice that the sale had been cancelled due to the purchaser's failure to settle. Five stock certificates representing 500 shares in Intergeneral were returned to him with the letter. All of the certificates were in the name of one L. Zaharis and only two had been endorsed. Pappas continued to complain to Planners after the September 18 letter but again received no satisfactory answers. After Planners was placed in liquidation, he filed a claim with the trustee on October 16, 1971.

Under section 6 of the Act only those clients of a brokerage firm in liquidation, as Planners is here, who are "customers", 15 U.S.C. § 78fff(c)(2)(A)(ii), are effectively insured against loss by the guarantee of advances by the Securities Investor Protection Corporation (SIPC) to a "single and separate fund", id. § 78fff(c)(2)(B), for reimbursement of the "net equity", id. 78fff(c)(2)(A)(iv), they have entrusted to the brokerage firm as of the filing date in the liquidation proceeding. See generally SEC v. F. O. Baroff Co., Inc., 497 F.2d 280, 281 (2d Cir. 1974); SEC v. Aberdeen Securities Co., Inc., 480 F.2d 1121, 1123–24 (3rd Cir.), cert. denied, 414 U.S. 1111, 94 S.Ct. 841, 38 L.Ed.2d 738 (1973); Annot., 23 A.L. R.Fed. 157 (1975). Section 6 defines "customers" narrowly to include only those persons "who have claims on account of securities received, acquired, or held by the debtor from or for the account of such persons" in connection with certain specified business purposes and those persons who have "de-

posited cash with the debtor for the purpose of purchasing securities . . . ".

The definition of "customer" in section 6 indicates a Congressional purpose to provide relief similar to a preference only to the clients of the brokerage firm who have "entrusted" property to the brokerage firm as of the filing date. *SEC v. Kenneth Bove & Co., Inc.*, 378 F.Supp. 687, 699 (S.D.N.Y.1974). It is clear from the recitation of facts above that Pappas was not such a client. The securities at the center of this controversy were no longer entrusted to Planners as of the filing date. They had, in fact, been in Pappas' hands for nearly a year as of the filing date. Consequently, Pappas is not one of the persons whom the statute protects by assuring payment out of the single and separate fund for which SIPC provides a guarantee.

Accordingly, it is ordered that the trustee's objection to the claim of Stephen Pappas, who has been found not to be a "customer" within the meaning of section 6 [15 U.S.C. § 78fff(c)(2)(A)(ii)] be and hereby is affirmed and adopted.

### B. *The Putnam Claim*

The claim filed by F. L. Putnam & Company, Inc. (Putnam), concerns 200 shares of Golden Crest Records which Planners was to deliver to Putnam under a purchase made by Putnam for one of its customers on January 14, 1971. As a result of certain bookkeeping deficiencies on the part of Putnam, Putnam did not discover until December 1971 that the 200 shares had not been delivered by Planners. On December 10, 1971 Putnam "bought in" the 200 shares of Golden Crest Records for $600.[1] It now seeks to be reimbursed under the "open contractual commitments" provision of section 6(d) [15 U.S.C. § 78fff(d)] for closing out this contract which was open as of the filing date. The trustee refused to allow the claim since "[c]laimant's fail position was open for a period in excess of 30 days from the date of the filing of the proceedings and not closed within 30 days of said filing".

The Act provides that the trustee is required to complete certain contractual commitments of the debtor outstanding on the filing date. Section 6(d). In an earlier memorandum in this case the court ruled that the phrase "open contractual commitments" in section 6(d) was "designed to deal not with all orders placed with the insolvent broker but rather with those involving inter-broker orders which were not complete on the date of filing". Memorandum of June 23, 1972 at 3. *Cf. SEC v. Aberdeen Securities Co., Inc., supra* at 1125–26 & n.10. Putnam contends that its claim is such an inter-broker order. The issue for determination is whether the trustee's rejection of Putnam's claim was proper.

Current regulations of the Securities and Exchange Commission (SEC) now bar the type of claim presented by Putnam here. Under Rule S6d–1, 17 C.F.R. § 240.-206d–1, the SEC excludes from coverage as an "open contractual commitment" any fail to deliver which had a settlement date[2] in excess of 30 days prior to the filing date.[3] 17 C.F.R. § 240.206d–1(b), (c)(1)(ii)(A). Rule S6d–1 also requires that completion by the broker through a buy-in take place "within or promptly upon the expiration of a period of 30 calendar days after the set-

1. In its March 1, 1972 letter to the trustee and its claim dated March 20, 1972 Putnam indicated that the buy-in for the 200 shares occurred in December 1971. In his oral presentation to the court at its hearing on this matter, counsel for the trustee stated that the buy-in occurred in December 1971. This representation was not challenged by Putnam at the hearing and the court finds that the buy-in occurred in December 1971.

The court notes that in a brief narrative appended to a letter to the trustee dated November 25, 1974 Putnam stated that the buy-in

occurred June 9, 1971. This factual allegation was not pressed at the hearing by Putnam. Further, the court's decision on the trustee's objections would not be altered even if Putnam's alternative factual allegation were accepted.

2. The settlement date for the transaction which forms the basis of Putnam's claim was January 21, 1971.

3. In its Memorandum of June 23, 1972 the court determined the filing date applicable in this case to be August 3, 1971.

tlement date". 17 C.F.R. § 240.206d–1(d)(1)(i). Further, under a related regulation, Rule 15c3–3, 17 C.F.R. § 240.15c3–3, the SEC requires a broker whose records show securities as failed to receive for more than 30 days to take prompt steps to obtain possession of the securities "through a buy-in procedure or otherwise". 17 C.F.R. § 240.15c3–3(d)(2). The parties agree, however, that neither Rule S6d–1 nor Rule 15c3–3 is applicable to Putnam's claim. The effective date for Rule S6d–1 was July 25, 1973, and the effective date for Rule 15c3–3 was January 15, 1973; both dates occurring some time after the events alleged in the claim. While Congress left the definition of what should constitute an open contractual commitment to SEC, any such definition by rule cannot be applied retroactively. *SEC v. Kelly, Andrews & Bradley, Inc.*, 385 F.Supp. 948, 952 & n.15 (S.D.N.Y. 1974). Nevertheless, the origins and purposes of the two rules are instructive in connection with the efforts of the court to provide a meaning for the phrase "open contractual commitments" applicable to a transaction prior to the effective date of Rule S6d–1. When read together, the administrative histories of Rule 15c3–3 and Rule S6d–1 evidence recognition by SEC,

the agency charged by Congress with providing the definitive construction of section 6(d), that these rules merely codified existing procedure and that this codification was in turn viewed as necessary to further the policies of SEC designed to protect the investing public by insuring prompt attention to customer accounts and close supervision over the "back office" operations of broker-dealers.[4]

Allowance of Putnam's claim would entail disregard of sound industry practice and clearly articulated SEC policy, as ultimately codified in Rule S6d–1, by giving recognition under section 6(d) to a fail to deliver which remained open from January 14, 1971 to December 10, 1971, and for more than 30 days prior to the filing date for the liquidation proceedings, due to Putnam's deficient bookkeeping. Such a decision would also fail to accord proper consideration to the Congressional purpose in enacting the Securities Investor Protection Act. In *SEC v. Kelly, Andrews & Bradley, Inc., supra,* a case involving a broker's claim based on a transaction which antedated Rule S6d–1, as here, the court said:

> Section 6(d) should not be interpreted to allow brokers to sit back in the event of a "fail to receive" and come to SIPC

4. In the course of its administrative consideration of Rule 15c3–3, the SEC made clear its understanding of the custom among brokers with respect to fails to deliver. The Commission noticed a revised proposal to Rule 15c3–3 for comment on September 14, 1972. SEC, Securities Exchange Act Release No. 9775, [1972–1973 Transfer Binder] CCH Fed.Sec.L. Rep. ¶ 78,989. In its release announcing the revised proposal the SEC noted that "under subparagraph (d)(2), the time after which a fail to receive must be reduced to possession through a buy-in or other procedure has been extended from 25 to 30 days which conforms this time frame with existing practices of stock exchanges on buy-ins . . .". *Id.* at 82,127. The 30-day time frame was incorporated in the Rule as subsequently adopted by the SEC on November 13, 1972. SEC, Securities Exchange Act Release No. 9856, [1972–1973 Transfer Binder] CCH Fed.Sec.L.Rep. ¶ 79,083. The SEC stated as one of the purposes for the newly adopted rule a desire "[t]o require a broker-dealer promptly to obtain possession or control of all fully paid securities and excess margin securities carried by that broker-dealer

for the account of customers and to require him to act within designated time frames where possession or control has not been established". *Id.* at 79,083.

Shortly after adopting Rule 15c3–3, the SEC noticed for comment a proposal for Rule S6d–1. SEC, Securities Investor Protection Act Release No. 2, [1972–1973 Transfer Binder] CCH Fed.Sec.L.Rep. ¶ 79,150. In an apparent reference to its recent adoption of Rule 15c3–3, the SEC stated that "[d]iscouraging open fails has been an objective of the Commission in numerous other rules recently promulgated by it, and proposed Rule S6d–1 further implements that concept". *Id.* at 82,502. The release also noted that "[i]n this rule the Commission intends to close off stale transactions from receiving recognition other than as a possible claim against the debtor's estate". *Id.* In its July 25, 1973 release adopting proposed Rule S6d–1, the Commission restated virtually verbatim the views quoted above from the proposal release. SEC, Securities Investor Protection Act Release No. 5, [1973 Transfer Binder], CCH Fed.Sec.L. Rep. ¶ 79,425 at 83,220.

for payment out of funds supplied by the industry; to do so would contravene the congressional policy underlying the provision. As has been pointed out, "the objective of SIPA was to protect members of the investing public, not brokers"; it was not intended to be " 'a bail out operation' for others." . . . [Footnotes omitted]

*Id.* at 954. *Cf. SEC v. F. O. Baroff Co., Inc., supra* at 283–84; *SEC v. Packer, Wilbur & Co.*, 498 F.2d 978, 984 (2d Cir. 1974). The court finds the language of *Kelly, Andrews* persuasive, and adopts it as applicable here.

Accordingly, it is ordered that the trustee's objection to the claim of Putnam under the "open contractual commitments" provision of section 6(d) of the Act be and hereby is affirmed and adopted.