In re BRENTWOOD SECURITIES, INC., Debtor.

SECURITIES INVESTOR PROTECTION CORPORATION, Appellant,

v.

PEPPERDINE UNIVERSITY, Appellee.

SECURITIES INVESTOR PROTECTION CORPORATION, Appellant,

v.

Mina Kolb McMURRAY, Appellee.

SECURITIES INVESTOR PROTECTION CORPORATION, Appellant,

v.

John BIRMINGHAM, Appellee.

SECURITIES INVESTOR PROTECTION CORPORATION, Appellant,

v.

Mike E. O'NEAL, Appellee.

BAP Nos. CC 87–1291 MoVJ to CC 87–1294 MoVJ.

SIPA No. LA 85–0284–BR.

United States Bankruptcy Appellate Panel of the Ninth Circuit.

Argued and Submitted Jan. 21, 1988.

Decided June 21, 1988.

Theodore H. Focht, General Counsel, Securities Investor Protection Corp., Washington, D.C., for appellant.

Gary A. Hansen, General Counsel, Malibu, Cal., Emilio T. Gurrola, McKiernan, Gurrola, Moriwaki & Brady, Los Angeles, Cal., for appellees.

Mike E. O'Neal, Malibu, Cal., in pro per.

Before MOOREMAN, VOLINN and JONES, Bankruptcy Judges.

MOOREMAN, Bankruptcy Judge:

These four appeals arise out of four separate orders issued by the bankruptcy court which determined that the appellees were "customers" of the debtor Brentwood Securities, Inc., (Brentwood), and thus eligible for protection under the Securities Investor Protection Act (SIPA). The Appellant, Securities Investor Protection Corporation (SIPC), essentially argues that the disputed investments were not made through Brentwood and accordingly the appellees do not fall within the category of *"customer"* of the debtor. Therefore, SIPC argues, the appellees are not entitled to protection under SIPA. These appeals involve essentially the same issue and have been consolidated by this Panel.

### FACTS

Brentwood Securities, Inc., is a stock brokerage and investment banking firm registered as a broker-dealer with the Securities Exchange Commission.[1] In November

---

1. Debtor "introduced" its retail securities business to another Los Angeles firm, Wedbush, Noble & Cooke, Inc., (Wedbush), because debtor did not maintain the minimum net capital required by the SEC to hold customer property and maintain customer accounts. Thus, all Brentwood customers were to establish ac-

1981, owner Nils Angert sold the debtor corporation to Chris Delahunty who became the debtor's sole shareholder and president, while Angert became vice president.

On February 7, 1985, the United States District Court for the Central District of California entered an order, determining that the customers of Brentwood were in need of protection under SIPA. SIPC was appointed Trustee for the liquidation of Brentwood pursuant to SIPA and the case was removed to the Bankruptcy Court pursuant to 15 U.S.C. § 78eee(b)(4) of SIPA.

Numerous claims were filed with SIPC. Each of the appellees' claims was denied in whole or in part by SIPC, and as a result, actions were commenced in the Bankruptcy Court by the filing of an opposition to each of the denials. A summary of the underlying transactions which are the subject of these appeals is set forth as follows.

*Pepperdine's Claim: CC–87–1291*

Pepperdine had opened an account with Brentwood and made certain investments through Brentwood in 1982.[2] These purchases were made through the "University's Brentwood Account" and were reflected in Brentwood's account statements. In making the above purchases, Pepperdine was instructed by Mr. Angert to wire transfer the funds to Wedbush.

In 1983, Mr. Delahunty and Mr. Angert met with Pepperdine to discuss investment in Comstock Gold, Silver and Copper Mines, Inc., (Comstock). Although Pepperdine had previously dealt with Mr. Delahunty as president of Brentwood, Mr. Delahunty informed Pepperdine that he was also the president of Comstock. Mr. Delahunty and Mr. Angert represented that the Comstock investment "offered the University a substantial profit in a short period of time because Comstock was expected to engage in a second public offering." Mr. Delahun-

ty also stated that he would issue a personal guarantee to Pepperdine if the stock was not marketable as represented.

Pepperdine agreed to purchase 40,000 shares of Comstock at $2.50 per share and *according to Mr. Angert's instructions,* a $100,000 check, *payable to Comstock,* was delivered to Mr. Angert at the Brentwood offices. Apparently, none of the parties involved discussed whether the Comstock purchase would actually "go through" the University's Brentwood Account and no account statement was issued evidencing the transaction or that a commission had been paid to Brentwood. On two occasions, Pepperdine wrote to Delahunty concerning the Comstock shares. The correspondence was addressed to Delahunty as President of Comstock, but sent to Brentwood's business address. In 1984, Pepperdine, in an attempt to ascertain documentary evidence of the purchase, was informed by the Secretary of Comstock that the registrar's books did not show any shares listed in Pepperdine's name. The SIPC disallowed the claim.

*O'Neal's Claim: CC 87–1294*

Mr. O'Neal, in addition to his involvement in the Pepperdine purchase, was also involved in certain transactions with Brentwood and Mr. Delahunty. Initially, Mr. O'Neal opened an account at Brentwood and purchased 2,200 shares of Caribe Petroleum, Inc., common stock. Pursuant to instructions from Mr. Angert, the purchase was made by personal check *payable to Wedbush. See* nt. 1 (*supra*). Following Pepperdine's purchase of the Comstock shares, O'Neal also sought to purchase $6,000 of the same stock.

Again in accordance with Mr. Angert's instructions, O'Neal drafted a check payable to Comstock and personally delivered it to the Brentwood business offices. As in the Pepperdine purchase, personal corre-

---

counts with Wedbush, thereby permitting Brentwood to do business with $5,000 in net capital.

**2.** Pepperdine's investments were made by Mr. McCord (Pepperdine's Treasurer) and Mr. O'Neal (Pepperdine's Vice President of Business Affairs). Although both McCord and O'Neal

also made personal investments with Delahunty, only O'Neal appealed SIPC's disallowance of his claim (*infra*). Apparently, McCord never had an actual account with Brentwood and did not file a notice of appeal from the trial court's disallowance of his SIPA claim.

spondence sent to Mr. Delahunty by Mr. O'Neal was addressed to Delahunty as President of Comstock, and sent to Brentwood's business address.

In a subsequent transaction, Mr. O'Neal also tendered the Caribe Petroleum stock in exchange for shares in Comstock. The Caribe Petroleum shares and stock power were sent to the Brentwood offices. O'Neal's $6,000 claim filed with SIPC was disallowed.

### McMurray's Claim: CC 87–1292

SIPC allowed and paid a portion of McMurray's claim as a protected customer claim for cash in the amount of $25,000. The remainder of the claim was for $105,-000 and was based on three separate transactions, for $20,000, $75,000 and $10,000 respectively. The transactions were for the purchase of 95,000 shares of American Mineral Resources (AMR) and 10,000 shares of Communication Development Co. (CDC), a limited partnership. Prior to the subject transactions involving the AMR and CDC shares, McMurray had engaged in several securities transactions with Brentwood, and maintained an account with them.

In 1981, at the recommendation of Delahunty, McMurray sought to purchase 20,-000 shares of stock from AMR and in accordance with Mr. Delahunty's instructions made the check payable to "C.J. Delahunty/AMR." Delahunty was the Chairman of the Board of AMR. In 1982, McMurray again pursuant to Delahunty's recommendation sought to purchase additional AMR stock for the sum of $75,000. On this occasion, the check was made payable to American Mineral Resources, again at the instruction of Mr. Delahunty.

In 1983, McMurray also sought to purchase "stock" in CDC and drafted a check for $10,000 payable to CDC. No documentary evidence of the above purchases were

listed on McMurray's Brentwood account and SIPC disallowed the $20,000, $75,000 and $10,000 claims filed by McMurray.

### Birmingham's Claim: CC 87–1293

Birmingham's claim arises out of transactions with Delahunty prior to Delahunty purchasing Brentwood Securities. In 1979, Birmingham "opened an account at Delahunty & Rezin" by depositing $18,000.[3] In 1980, Birmingham's account had grown to $20,000 and he authorized Delahunty to purchase 20,000 shares of AMR with that sum. Later, Birmingham sought to purchase another 10,000 shares of AMR stock by tendering a check for $10,000 to Delahunty payable to Delahunty & Rezin. These transactions occurred *prior to Delahunty purchasing Brentwood.* In 1981, Delahunty "transferred" Birmingham's account (allegedly containing 30,000 shares of AMR) from Delahunty & Rezin to Brentwood. There is no documentary evidence to support these transactions.[4] Birmingham's $30,000 claim was denied by SIPC.

### Proceedings Below

In making its ruling on Pepperdine's claim, the trial court determined that Pepperdine had an open account with Brentwood and the $100,000 attempted purchase of Comstock shares was pursuant to Brentwood's instructions. Accordingly, the trial court ordered that SIPC pay Pepperdine the sum of $100,000 pursuant to SIPA.

With regard to O'Neal's claim the trial court determined that O'Neal reasonably believed he was dealing with Brentwood, and satisfied the customer requirement of SIPA. Accordingly, the court ordered that SIPC pay O'Neal $6,000 pursuant to SIPA.

The trial court also determined that based on the factual background of McMurray's relationship with Brentwood, Ms. McMurray was also entitled to customer protection of SIPA. Accordingly, the

---

**3.** It is unclear whether Delahunty & Rezin was a brokerage firm or an accounting firm. Although at the trial Delahunty and Rezin was referred to as a brokerage firm, SIPC's brief refers to it as an accounting firm and this is not disputed in Birmingham's brief.

**4.** The briefs discuss other purchases by Birmingham, however, the trial court ruled that Birmingham was not entitled to recover those amounts and those rulings were not appealed and are deemed final.

court ordered that SIPC: (a) pay McMurray $10,000 arising from the CDC transactions and (b) transfer 95,000 shares of AMR stock to McMurray, or if the shares could not be purchased, pay McMurray the sum of $95,000.

Finally, with regard to the claim of Mr. Birmingham, the court determined that although the 30,000 shares in AMR had not been purchased through Brentwood, it was reasonable for Birmingham to assume that the account had been *transferred* to Brentwood and therefore he should also be allowed protection under SIPA as a customer. Accordingly, the trial court ordered that SIPC transfer 30,000 shares of AMR stock to Birmingham, or if the shares could not be purchased on the open market, SIPC was to pay Birmingham the sum of $30,-000.

SIPC filed timely notices of appeal in each of the above cases and the cases were consolidated by order of this Panel dated August 14, 1987.

## DISCUSSION

SIPA was enacted by Congress to:

afford protection to public customers in the event broker-dealers with whom they transact business encounter financial difficulties and are unable to satisfy their obligations to their public customers.

*SEC v. Alan F. Hughes, Inc.*, 461 F.2d 974, 977 (2d Cir.1972). Additionally, the legislative history reflects that the purpose of SIPA was to protect customers of brokerage houses, restore investor confidence in the securities market and upgrade the financial responsibility of brokers dealers. *See e.g. S.E.C. v. Albert & Maguire Securities Co., Inc.*, 560 F.2d 569, 571 (3d Cir. 1977); *S.E.C. v. White & Co., Inc.*, 546 F.2d 789, 791 (8th Cir.1976).

SIPC was established to liquidate a broker or dealer when customers' assets are in danger and in the case of a failed broker or dealer, a customer's claim is insured by SIPC, just as the depositor of a failed bank receives protection from the FDIC. *In re Stalvey & Associates, Inc.*, 750 F.2d 464, 467 (5th Cir.1985). SIPA also provides for enforcement of customers' rights through the bankruptcy courts. *S.E.C. v. White & Co.*, 546 F.2d at 791.

The bone of contention in the instant appeal is whether the appellees' claims fall within the protection of the SIPA. SIPA does not protect all creditors of a broker or dealer, but is limited to "customers" as defined in section 78*lll* (2).

The term "customer" of a debtor means any person ... who has a claim on account of *securities* received, acquired, or *held by the debtor* in the ordinary course of its business as a broker or dealer from or for the securities accounts of such person for safekeeping, with a view to a sale, to cover consummated sales, pursuant to purchases, as collateral security, or for purposes of effecting transfer. The term "customer" includes any person who has a claim against the debtor arising out of sales or conversions of such securities, and *any person who has deposited cash with the debtor for the purpose of purchasing securities,* ....

15 U.S.C. § 78*lll* (2) (emphasis added).

For purposes of reviewing whether a person is entitled to customer status under SIPA, it is recognized that " '[c]ustomer' ... is a statutorily defined term of art" and as such is solely a question of law subject to de novo review. *In re Stalvey*, 750 F.2d at 468; *see also United States v. Roberts*, 747 F.2d 537, 546 (9th Cir.1984) (recognizing that interpretation of statutory language is a question of law).

SIPC argues that the trial court erroneously determined that because each of the four appellees maintained Brentwood accounts, they were thereby entitled to protection under SIPA. SIPC relies primarily on the case of *In re Stalvey* (supra), which recognized that merely establishing a broker-customer relationship is insufficient if the claimant is unable to show that he was a "customer" with respect to the particular transaction which underlies the claim.

Although SIPC's legal argument is correct, SIPC failed to refute the evidence that appellees Pepperdine, O'Neal and McMurray each paid the subject funds in accordance with the instructions from ei-

ther Mr. Angert or Mr. Delahunty. SIPC places great weight on the fact that Delahunty "confronted" Pepperdine and O'Neal as president of Comstock. However, it is undisputed that Mr. Angert was not an officer or employee of Comstock and the appellees' payments were made pursuant to Mr. Angert's instructions. Mr. Angert was at all relevant times acting as Brentwood's agent and it was reasonable for the appellees to conclude that their investments were through Brentwood and not through Mr. Delahunty personally. Additionally, the actual funds in question were either sent to or deposited at the Brentwood offices.

SIPC cites to the fact that both Pepperdine and O'Neal addressed correspondence to Mr. Delahunty as president of Comstock. This fact was explained, however, in Mr. O'Neal's testimony that the caption was essentially just taken off prior correspondence from Mr. Delahunty guaranteeing the appellees' purchase. Further, the subject transactions were conducted through Brentwood's business address. Although the transactions may have lacked good judgment in hindsight, the undisputed facts support a conclusion that Pepperdine, O'Neal and McMurray reasonably assumed they were investing *through the debtor* and thus, should be afforded the protection set forth in SIPA. *See In re Gibralco, Inc.*, 53 B.R. 324 (Bankr.C.D.Cal.1985) (recognizing that persons were entitled to customer status under SIPA, even though bonds they *deposited with the debtor/broker* were never actually deposited in the individuals accounts).

In the instant case, the procedures surrounding the subject transactions were also essentially in accord with previous transactions involving the appellees which SIPC does not dispute as being within the protection of SIPA. Under these circumstances and the record before this Panel, we find that the subject transactions arose out of the *"ordinary course of [the debtor's] business"* and Pepperdine, O'Neal and McMurray *"deposited [the] cash with the debtor for the purpose of purchasing securities."* 15 U.S.C. § 78lll(2). Accordingly, Pepperdine, O'Neal and McMurray

satisfy the customer definition under SIPA for purposes of the transactions at issue. 15 U.S.C. § 78lll (2). To hold otherwise on this record, would "erode investor confidence in the capital markets and thus tend to undermine one of the objectives which Congress sought to achieve" *In re Gibralco*, 53 B.R. at 329.

■ A similar outcome is also warranted with regard to Birmingham's claim. SIPC relies heavily on the fact that Birmingham sought to purchase the subject securities prior to Delahunty's purchase of Brentwood. However, the clear definition of "customer" under SIPA includes "any person ... *who has a claim on account of securities received, acquired, or held by the debtor* in the ordinary course of its business as a broker or dealer from or for the securities accounts of such person *for safekeeping....*" 15 U.S.C. § 78lll (2).

Additionally, it is clearly recognized that the key in determining customer status for purposes of SIPA is whether the person seeking protection has *"entrusted* his securities to a broker for some purpose connected with participation in the securities market." *S.E.C. v. F.O. Baroff Co., Inc.*, 497 F.2d 280, 283 (2d Cir.1974) (emphasis added). *See also S.E.C. v. Kenneth Bove & Co., Inc.*, 378 F.Supp. 697, 699–700 (S.D.N.Y.1974); *S.E.C. v. Securities Planners Ltd., Inc.*, 416 F.Supp. 762, 764 (D.Mass. 1976).

When Birmingham was notified that his account was transferred to Brentwood, he reasonably believed that his securities were being held by the debtor for safekeeping or for subsequent transfer. As previously set forth, this Panel will seek to interpret the statutory language in light of the express Congressional policy underlying the legislation. Under these circumstances, the record supports a finding that Birmingham "entrusted" his securities to the debtor and is entitled to the protection afforded under SIPA.

### The Extent of McMurray's Claim

Although McMurray is entitled to customer status under SIPA, there is an addi-

tional issue as to the extent and amount of her claim. SIPA protection is limited to $500,000 of a customer's lost net equity. 15 U.S.C. § 78fff–3(a). However, a customer's "cash claim" is limited to $100,000. 15 U.S.C. § 78fff–3(a)(1). SIPC allowed McMurray's "securities claim" for $25,000 which was the value of 400 shares of IBM stock at the time of liquidation. SIPC now argues that, the trial court erred in awarding McMurray an additional $105,000.

■ The actual SIPC claim form executed by McMurray sets forth her "cash claim" at $105,000. App. at 176. This amount was derived from her payment of $95,000 for the purchase of AMR stock and $10,000 for the purchase of an interest in CDC. Pursuant to 15 U.S.C. § 78fff–3(a)(1), McMurray is limited to recovering $100,000 of a cash claim. Thus, McMurray cannot recover the full $105,000 as contemplated by the trial court's order. Although this issue was pointed out to the trial court apparently there was some confusion as to the SIPA limitation.

■ Additionally, SIPC argues that CDC was a *limited partnership* and therefore any attempted investment in CDC by McMurray is not covered by SIPA. The term "security" for purposes of SIPA is defined in 15 U.S.C. § 78*lll* (14), and essentially adopts the broad language of a security as defined in the Securities Act of 1933. 15 U.S.C. § 77a et seq. However, the important difference is that under SIPA a covered security is limited to those securities which are *"the subject of a registration statement with the Commission* pursuant to the provisions of the Securities Act of 1933." 15 U.S.C. § 78*lll* (14). It is apparent from the record that the trial court in considering this issue addressed only the broad language generally applicable to a security, i.e. "investment contract, or profit sharing arrangement."

Nothing in the record indicates that CDC was subject to a registration statement with the SEC. Further, McMurray does not dispute the fact (nor address the issue) that CDC was a limited partnership. A limited partnership interest is generally not considered a security under the 1933 Act definition, because of the managerial control generally allotted to the limited partners. *See United States v. Morse,* 785 F.2d 771, 776 (9th Cir.1986) (citing *S.E.C. v. W.J. Howey Co.,* 328 U.S. 293, 66 S.Ct. 1100, 90 L.Ed. 1244 (1946)). On this basis, SIPC is correct in arguing that McMurray's claim for the $10,000 investment in CDC is not protected under SIPA and McMurray is left to seek other remedies.

■ SIPC finally argues that because it allowed McMurray's claim for $25,000, the trial court should have only allowed her additional claims to the extent of $75,000. Again, this argument is based on the $100,000 limitation placed on "cash claims" under 15 U.S.C. § 78fff–3(a)(1). This argument, however, fails in light of the clear language of section 78fff–3(a), which provides that the "SIPC shall advance ... such *moneys, not to exceed $500,000* for each customer, as may be required to pay or otherwise satisfy claims...." 15 U.S.C. § 78fff–3(a). SIPA protects a customer's claim to the extent of his "net equity." *Id.* The subsection (1) cited by SIPC is merely a limitation on the above cited general rule and indeed makes the distinction between a *cash* claim and a "claim for *securities."* In other words, a customer is entitled to $500,000 of protection of its *total* claims, but not more than $100,000 of protection for *cash* claims. The $25,000 claim allowed by SIPC was clearly within the definition of a *claim for securities* and not cash. Thus, the $100,000 limitation for cash claims is not applicable. SIPC does not set forth any rationale why the $25,000 for the IBM stock should not be considered as payment in satisfaction of a claim for securities. Accordingly, McMurray is entitled to $95,000 as a *cash claim,* representing her interest in AMR stock which was never purchased by the debtor.[5]

---

5. Further support for recognizing the $25,000 as a claim for securities is also found in section 78*lll* (11) which defines "net equity" when determining the amount of a given claim. Also, section 78fff–2(d) recognizes the power of the trustee to purchase securities on the open market in order to satisfy a customer's claim for securities. The discretion given the trustee to

## CONCLUSION

Based on the foregoing, the trial court is AFFIRMED with regard to its holding that the appellees are entitled to protection under SIPA, but REVERSED to the extent that the order requires SIPC to pay McMurray $10,000 for the limited partnership investment.

either satisfy a customer's *securities* claim by cash payment or purchase of the security does

not change the status of McMurray's $25,000 claim.