**In re BRENTWOOD SECURITIES, INC., Debtor.**

**Michael C. JACKMAN, Appellant,**

**v.**

**SECURITIES INVESTOR PROTECTION CORPORATION, Appellee.**

**BAP No. CC–87–1683 MoPJ.**
**SIPA No. LA 85–00284 BR.**

United States Bankruptcy Appellate Panel of the Ninth Circuit.

Argued and Submitted Nov. 16, 1988.

Decided March 9, 1989.

Emilio T. Gurrola, McKiernan, Gurrola, Moriwaki & Brady, Los Angeles, Cal., for appellant.

William H. Seckinger, Associate Gen. Counsel, Securities Investor Protection Corp., Washington, D.C., for appellee.

## OPINION

Before MOOREMAN, PERRIS and JONES, Bankruptcy Judges.

MOOREMAN, Bankruptcy Judge:

This appeal arises out of the bankruptcy court's order denying in part the appellant's claim for protection under the Securities Investor Protection Act (SIPA).

## FACTS

The debtor, Brentwood Securities, Inc. ("Brentwood"), is a stock brokerage and investment banking firm registered as a broker-dealer with the Securities Exchange Commission. Because the Brentwood did not maintain the minimum net capital required by the SEC to hold customer property and maintain customer accounts, Brentwood customers were required to establish accounts with Wedbush, Noble & Cook, Inc. ("Wedbush"), another broker-dealer. Wedbush sent Brentwood customers regular statements setting forth the status of the customer's account. *See In re Brentwood*, 87 B.R. 602, 603 nt. 1 (9th Cir.BAP 1988).

In February 1985, a liquidation proceeding was initiated by the Securities Investment Protection Corporation (SIPC), against Brentwood in the United States District Court for the Central District of California.[1] The district court appointed SIPC as the trustee for the liquidation of Brentwood and removed the case to the bankruptcy court pursuant to 15 U.S.C. § 78eee(b)(4) of SIPA.

The appellant, Michael C. Jackman, asserted a claim for protection under SIPA on the basis of the following facts. On September 3, 1981, Jackman wire transferred $200,000 from Ireland to Brentwood's bank account, purportedly to be deposited in an investment account. However, by a letter dated September 1, 1981, Jackman authorized the bank to transfer these funds to the personal account of Christopher Delahunty, Brentwood's president.[2] On September 8, 1981, Delahunty withdrew $180,000 of the $200,000 and deposited it in his personal account.

On that same date, an account was opened for Jackman at Brentwood's clearing broker (Wedbush). Shortly thereafter, Delahunty deposited $120,000 into the account. On September 9, 1981, "$1,000,000 face value United States Treasury Bonds 8% 1996/2001" were purchased for Jackman's account at Wedbush. These bonds were purchased for $600,217.39, with a $120,000 personal check from Delahunty and by borrowing the balance of the purchase price on a margin loan.[3] After this initial transaction, Jackman's Wedbush account statement reflected only this $120,000 deposit and not the $200,000 originally transferred from Jackman to Brentwood. The 1996/2001 Treasury Bonds were sold on November 25, 1981, at profit of approximately $70,000. Adding the $120,000 already reflected in Jackman's Wedbush account statement and the $69,456.52 profit realized on the sale of the 1996/2001 Treasury Bonds, it would appear that the Wed-

---

1. "[T]he purpose of SIPA was to protect customers of brokerage houses, restore investor confidence in the securities market and upgrade the financial responsibility of brokers dealers." *In re Brentwood Securities, Inc.*, 87 B.R. at 606 (citations omitted).

   "SIPC was established to liquidate a broker or dealer when customers' assets are in danger and in the case of a failed broker or dealer, a customer's claim is insured by SIPC, just as the depositor of a failed bank receives protection from the FDIC." *Id.*

2. Although this letter was not included in the appellant's Excerpts of Record, it is referred to in the transcript from the court below and Jackman does not dispute the fact that the letter specifically authorized the transfer of the funds at issue.

3. A margin loan is a loan through a broker-dealer which enables a customer to purchase the securities with a payment of a certain percentage of the purchase price. The customer takes the market risk for the entire position and the securities collateralize the loan.

bush account contained a balance of approximately $190,000, following the sale. Within the next five months, Delahunty made three cash withdrawals from Jackman's Wedbush account totaling $170,000. In January of 1983, Delahunty deposited $150,000 into Jackman's account, leaving $20,000 of the $170,000 withdrawn by Delahunty from the account still unaccounted for and unreplaced.[4]

Contemporaneously with the $150,000 deposit by Delahunty into Jackman's account, a second purchase of $1,000,000 face value U.S. Treasury Bonds 1993/1998 was made on Jackman's instructions and listed on Jackman's Wedbush account. The $150,000 deposited funds were used to purchase the bonds and the remainder of the purchase was again made on a margin loan.[5] In May 1983, Jackman withdrew $50,000 from his Wedbush account, thereby increasing his margin indebtedness to Wedbush. On August 3, 1983, the Treasury Bonds were sold from the account on a margin call at a net loss to Jackman of $81,341.93.[6] On August 10, 1983, Jackman withdrew $25,332.66 out of his account leaving a balance of $49.49.

On the basis of the above series of events, Jackman asserted a claim for protection under SIPA.[7] However, Juliet Jobling–Purser also filed a claim asserting that she, and not Jackman, was entitled to the funds sought in the claim filed by Jackman. Ms. Purser argued that Jackman entered the transactions at issue as a trustee of a trust of which she was the beneficiary. Ms. Purser was accordingly allowed to intervene on the matter.

Pursuant to the prescribed procedure, the SIPC notified Jackman and Ms. Purser that the claims were disallowed in their entirety. Both Jackman and Ms. Purser filed an objection to the SIPC's denial of the claims.

The bankruptcy court determined that it would first decide the validity of the claims under SIPA and then at a later proceeding, address the issue as to who was rightfully entitled to any allowed claims. Accordingly, the hearing on the validity of the claims was held on April 28, 1987, wherein the bankruptcy court determined that a "protected cash claim" had been established in the amount of $20,000.

The bankruptcy court ruling was based *inter alia* on the conclusion that Jackman:

had some sort of a side deal with Mr. Delahunty that [$80,000] [see note 4] would go out, they'd do with what they want. [sic] They had some deal, who knows what it was.

... As a neutral bystander looking at this, its quite obvious something was going on strictly between Mr. Delahunty and Mr. Jackman.

Essentially, the bankruptcy court had concluded that although the original $200,000 had been wired to Brentwood for the purpose of acquiring investments that would have been covered by SIPA, a subsequent agreement was later entered into between Jackman and Delahunty that the $200,000 funds would be used in a separate business deal of some kind. Accordingly, an account entitled to SIPA protection was

4. The Bankruptcy court determined only this $20,000 amount would be afforded protection under SIPA. Appellant's entire argument is based on this $20,000 amount and the $80,000 "missing" amount which is the difference between the original $200,000 transfer and the $120,000 check from Mr. Delahunty used to open the Wedbush account.

5. Jackman contends that the $150,000 was the proceeds from the sale of 150 of the 419 bonds, discussed above, allegedly held for safe-keeping by Brentwood. Jackman further contends that he intended the 419 bonds to be used as collateral for the purchase of the 1993/1998 bonds.

6. Although Jackman contends he had demanded that Delahunty transfer his account to another

broker, this was not done and the 1993/1998 bonds remained in Jackman's Wedbush account at the time of the margin call.

7. Jackman's initial claim filed with the SIPC set forth the amount of his claim as of the filing date as follows:

| | |
|---|---|
| Claim for Cash Credit Balance– | $170,000 |
| Claim for Bonds: | |
| U.S. Treasury Bonds 1993/1998– | $ 75,000 |
| U.S. Treasury Bonds 1996/2001– | $269,000 |
| Total | $514,000 |

not created until Delahunty deposited $120,000 into Jackman's newly created account for the purpose of purchasing the first set of Treasury Bonds.

Although the bankruptcy court had not yet determined whether Jackman or Ms. Purser would be entitled to the $20,000, Jackman brought this appeal seeking to set aside the denial of the remaining claims.

## DISCUSSION

### *Standing*

■ Initially, SIPC argues that Jackman lacks standing to bring the instant appeal since the bankruptcy court subsequently determined that Ms. Purser was rightfully entitled to *all* claims asserted by Jackman. Although this Panel previously denied SIPC's motion to dismiss this appeal based on the identical argument, SIPC again argues that because of the bankruptcy court's subsequent order, Jackman lacks standing to pursue this action.[8]

The facts relevant to SIPC's argument that this appeal should be dismissed for lack of standing are as follows. The bankruptcy court held a hearing on "the second portion" of this case on January 7, 1988. Pursuant thereto, the court determined that the allowed claim of $20,000 "is properly payable to intervenor Juliet Jobling–Purser, and not to Claimant Michael Jackman." Jackman did not file a notice of appeal from this order and accordingly, SIPC argues that Jackman lacks standing to appeal the instant order since he is not entitled to any proceeds arising out of the claim at issue.

SIPC's argument fails, however, in view of the undisputed fact that Jackman is the trustee of an express trust in which Ms. Purser is the beneficiary. Accordingly, Jackman may well be responsible for any

trust funds which were lost as a result of a breach of the fiduciary duty. Given the fact that Ms. Purser contends the trust funds were lost because of Jackman's breach of fiduciary duty, Jackman may have a substantial stake in the outcome. Based on these undisputed facts, Jackman does have standing to prosecute this appeal as trustee of the express trust.

### *Merits*

The issue on the merits of this appeal is whether Jackman is entitled to protection as a "customer" under SIPA for certain of his claims. Whether a person satisfies the statutory definition of a customer entitled to protection under SIPA is a question of law subject to de novo review. *In re Brentwood*, 87 B.R. at 606. A trial court's findings of fact giving rise to the determination of customer status, however, should be reviewed under the clearly erroneous standard. Bankruptcy Rule 8013.

Jackman asserts that he had no knowledge of and did not consent to the initial withdrawal of the transferred funds by Delahunty. Jackman also contends that after receiving the initial Wedbush statement of his account, he became concerned that only $120,000 was reflected and not the full $200,000 transfer. Accordingly, Jackman states that he requested all the Treasury Bonds be sold. Although the Wedbush account statements did not reflect the amount that Jackman considered to be in his account, he states that Delahunty assured him that "the property in [his] account was safe." Jackman contends that in November 1982, Delahunty informed him that 419 bonds with a face value of $419,000 had been purchased for a cost of $250,000 which is approximately the amount Jackman then considered to be in his "account with Brentwood."[9] Jackman

8. Ms. Purser did not file a notice of appeal from the initial order which limited the amount of the claim to $20,000. However, in response to the appellee's initial motion to dismiss this appeal, Ms. Purser's attorney filed a "Statement of Position Re Trustee's Motion to Dismiss." Ms. Purser's apparent position is that Jackman may prosecute this appeal only "in his capacity as trustee for Ms. Purser, and not in any separate individual right." Additionally, Ms. Purser's re-

sponse argues that her "objection to trustee's denial of claim" is still "pending" and although the order presently before this Panel may be *res judicata* as to that claim, she still may have separate substantive rights against the debtor.

9. Jackman argued at trial that although he was receiving account statements from Wedbush with a balance of approximately $190,000, he appears to have thought that a separate "Brent-

argued that he "demanded that [Mr. Delahunty] deliver the bonds to [Jackman], however, this was not done."

In January 1983, Jackman ordered 1993/1998 Treasury Bonds to be purchased and argues that he intended the 419 bonds "already in the account" to be used as collateral. The Treasury Bonds were, however, purchased on margin with a $150,000 personal check from Delahunty. Jackman argued that Delahunty had told him the $150,000 were the proceeds from the sale of 150 of the 419 bonds allegedly "held for safekeeping" by Brentwood. Jackman also contends that although he requested the 1993/1998 Treasury Bonds to be transferred to another broker, this was not done and eventually, a "forced sale" of the Treasury Bonds occurred pursuant to a margin call. Jackman asserted that had his account actually contained the amount of cash and securities that Delahunty had assured him existed, the equity in his account would have been sufficient to satisfy the margin call.

Accordingly, Jackman's asserted claim was for the value of the Treasury Bonds as of January 1983, 269 bonds with a $269,000 face value (419 less the 150 sold by Delahunty), and accrued interest on the account.

■ Jackman argues on appeal that he had sustained his burden of proving that he was a "customer" of Brentwood with respect to each claim made and therefore entitled to SIPA protection. Although the bankruptcy court determined that the initial transfer of $200,000 was "customer" property entitled to SIPA protection, Jackman's subsequent authorization to Delahunty to withdraw those funds to the personal account of Delahunty, removed them from SIPA protection.

It is recognized that although a person may be considered a "customer" with regard to some claims, this does not mean that "customer" status will be afforded as to all claims. *E.g. In re Stalvey Associ-*

ates, Inc., 750 F.2d 464, 471 (5th Cir.1985). The *Stalvey* court stated:

> [A claimant's] customer status in the course of some dealings with a broker will not confer that status upon other dealings, no matter how intimately related, unless those other dealings also fall within the ambit of the statute. "The Act contemplates that a person may be a 'customer' with respect to some of his claims for cash or shares, but not with respect to others." *S.E.C. v. F.O. Baroff Co.,* 497 F.2d 280, 282 n. 2 (2d Cir.1974). Customer status "in the air" is insufficient to confer the SIPA's protection on a given transaction.

*Id. See also In re Brentwood,* 87 B.R. at 606–07.

In the instant case, the bankruptcy court found that Jackman and Delahunty were involved in a separate "partnership." Accordingly, the court concluded that Jackman's claim was outside the scope of SIPA protection. Under the clearly erroneous standard, there is sufficient evidence in the record to support the bankruptcy court's finding. First, Jackman apparently drafted a letter authorizing Delahunty to draw from the original $200,000 transfer. Additionally, Jackman had moved from Ireland in July of 1982, because Delahunty had offered to hire Jackman to "provide the debtor with consultation services in areas of interest to the debtor." There is also evidence in the transcript that Delahunty and Jackman had previously discussed other business opportunities.

The bankruptcy court also determined that "the testimony of [Jackman] is not all that credible, quite frankly." This is supported by the fact that when Jackman requested his entire account be transferred to Merrill Lynch in July 1983, the only assets requested to be transferred were the 1993/1998 Treasury Bonds. This is inconsistent with Jackman's assertions that Brentwood also held 269 bonds in his account at that time period.

wood account" existed. Although no formal statements with such an account were ever received by Jackman, eventually he did receive a

hand written note allegedly from Delahunty setting forth an account balance listing the 419 bonds.

Additionally, Jackman never requested that Brentwood or Delahunty purchase the 419 bonds that Jackman argues should have been in the account. Finally, Jackman testified that "the bonds were used by Delahunty as collateral for his (Delahunty's) purchase of another company." These facts tend to support a finding that a separate "partnership" between Jackman and Delahunty existed. Accordingly, the bankruptcy court determined that with regard to these bonds "[t]here is no credible evidence or testimony that any such bonds were purchased by Mr. Delahunty *for Mr. Jackman's account.*"

Although Jackman introduced into evidence a hand written note on Brentwood's stationary and signed by Delahunty stating that Brentwood "holds in safekeeping for [Jackman's] account $269,000 face value U.S. Treasury Bonds," Bankruptcy Rule 8013 precludes this Panel from setting aside the bankruptcy court's findings unless clearly erroneous. Based on the facts set forth above, the evidence would support a conclusion that Jackman failed to establish his "customer" status regarding each of the underlying transactions with Brentwood.

Given these facts, the bankruptcy court's findings defeat as a matter of law Jackman's claim of customer status under SIPA. *See* 15 U.S.C. § 78*lll*(2) (defining "customer" as a person "who has a claim on account of securities *received, acquired,* or *held* by the debtor *in the ordinary course of its business as a broker dealer....*") (emphasis added).

Accordingly, the bankruptcy court's order is AFFIRMED.