**In re DONALD SHELDON & CO., INC., Debtor.**

**Don L. HORWITZ, Trustee for the Liquidation of Donald Sheldon & Co., Inc., Plaintiff,**

**v.**

**Donald SHELDON and Mary Schad, Defendants.**

**Bankruptcy No. 85–6538A.
Adv. No. 90–6256A.**

United States Bankruptcy Court, S.D. New York.

Dec. 18, 1992.

**386**

J.G. Strum, J.W. Schryber, D.S. Pegno, Kaye Scholer, Fierman, Hays & Handler, New York City, for plaintiff trustee ("trustee").

B.H. Finkelstein, C.R. Corbin, Jr., M.J. Halow, Finkelstein, Thompson & Loughran, Washington, DC, for defendants Donald Sheldon and Mary Shad ("defendants").

## MEMORANDUM OF DECISION
## ON 15 U.S.C. § 78*lll*(4) AND
## 11 U.S.C. § 741(4)

FRANCIS G. CONRAD, Bankruptcy Judge.[*]

This matter comes before us [1] on Trustee's *in limine* motion to exclude from the damages trial Section C of the Expert Report of Anthony J. Mottola, dated June 29, 1992. In the Memorandum of Decision that follows, we address the issue of whether overage proceeds from the sale of excess collateral, proceeds of customer securities hypothecated by the broker-dealer, and firm cash other than overage proceeds constitute "customer property" as defined in the Securities Investor Protection Act, 15 U.S.C. § 78*lll*(4) ("SIPA"), and the Bankruptcy Code, 11 U.S.C. § 101, *et seq.*

After our review of the respective briefs of the parties and the applicable law, we hold that the following funds are customer property: 1) overage proceeds from the sale of excess collateral, in proportion to the cash and securities that customers contributed to the lien or pledge liquidated; 2) proceeds from the sale of firm securities traceable to customer securities transferred by the debtor; and, 3) firm cash other than overage proceeds necessary to replenish the reserve account.

## PROCEDURAL BACKGROUND

On July 30, 1985, the Securities Exchange Commission ("SEC") filed a complaint in the District Court for the South-

---

[*] Sitting by special designation.

1. Our subject matter jurisdiction over this proceeding arises under 28 U.S.C. § 1334(b), the "Standing Order of Referral of Cases to Bankruptcy Judges" of the United States District Court for the Southern District of New York, dated July 10, 1984 (Ward, Acting C.J.), and

§§ 78*eee*(b)(2) and (b)(4) of the Securities Investor Protection Act, 15 U.S.C. § 78*lll*(4) ("SIPA"). This is a core matter under 28 U.S.C. § 157(b)(2)(O). This Memorandum of Decision constitutes findings of fact and conclusions of law under F.R.Civ.P. 52, as made applicable by Fed.R.Bankr.P. 7052.

ern District of New York against Donald Sheldon & Co., Inc. ("DSC") and certain of its affiliates alleging, *inter alia,* that DSC had violated federal securities laws. The District Court entered an order on July 31, 1985, which, *inter alia,* temporarily enjoined DSC's broker-dealer operations and appointed Stanley T. Lesser ("Lesser") as temporary receiver of DSC. Upon the application of the Securities Investor Protection Corporation ("SIPC"), the District Court appointed Lesser as trustee for the liquidation of DSC under §§ 78eee(a)(3), (b)(1) and (b)(3) of the Securities Investor Protection Act of 1970 ("SIPA"). The liquidation proceeding was moved to this Court in accordance with § 78eee(b)(4) of SIPA. Following the death of Stanley T. Lesser, Don L. Horwitz (the "Trustee") was appointed successor trustee for the liquidation of DSC.

On March 11, 1991, Trustee commenced this adversary proceeding under 11 U.S.C. § 542, § 78fff–3(a) of SIPA, New York Business Corporation Law § 720, and Federal Rules of Bankruptcy Procedure 7001 to recover money and property of Debtor's estate allegedly lost as a result of Defendant's breach of duty.

Following a nine day trial, on July 24, 1992 the jury returned a verdict against Defendants on the liability issue. The damages portion of the trial is now pending before us. At a hearing on September 17, 1992, we directed the parties to submit memoranda of law on the meaning of "customer property."

## FACTUAL BACKGROUND

DSC hypothecated to Security Pacific fully paid customer securities for purchase money loans. Security Pacific did not disburse the proceeds of these loans to DSC directly. Instead, Security Pacific disbursed the funds to a seller of securities with which DSC had contracted.

Ultimately, Security Pacific liquidated securities collateralizing its loan to DSC to satisfy DSC's outstanding obligations to it. Security Pacific liquidated approximately $10.1 million in securities to satisfy obligations of $9,894,514. The overage proceeds resulting from the liquidation of the loan equal approximately $758,271. Of the securities liquidated, $5,639,646, or 57%, represented fully paid customer securities and $4,254,868, or 43%, represented firm securities.

Although the fully paid customer securities that were hypothecated, and ultimately liquidated, amounted to approximately $5,639,646, the proceeds from the sale of firm securities totaled only $1,213,899. Firm securities in excess of $4 million therefore remain unaccounted.

On July 30, 1985, the Securities and Exchange Commission brought an injunction action against DSC's broker-dealer operations. At that time, DSC's customer reserve account carried a $1.2 million deficiency.

## DISCUSSION

The Securities Investor Protection Act of 1970 ("SIPA"), 15 U.S.C. § 78aaa *et seq.* (1981), was passed "to ensure that customers recover cash and securities from broker-dealers that fail or cease operations and cannot meet their obligations to customers." General Accounting Office, *Securities Investor Protection: The Regulatory Framework Has Minimized SIPC's Losses* 12 (1992) (GAO/GGD–92–109). SIPA provides for liquidation proceedings that distribute customer property and satisfy net equity claims of customers. 15 U.S.C. § 78fff(a)(1)(B).

The issue presented here is simply one of statutory interpretation. The Supreme Court has held that the plain language of the statute is strongly presumed to express Congressional intent. *Ardestani v. INS,* — U.S. —, —, 112 S.Ct. 515, 520, 116 L.Ed.2d 496 (1991). We, therefore, turn to the text of the applicable law.

"Customer property" is defined in SIPA § 78*lll* as follows:

(4) Customer Property

The term "customer property means cash and securities (except customer name securities delivered to the customer) at any time received, acquired, or held by or for the account of a

debtor from or for the securities accounts of a customer, and the proceeds of any such property transferred by the debtor, including property unlawfully converted. The term "customer property" includes—

(A) securities held as property of the debtor to the extent that the inability of the debtor to meet its obligations to customers for their net equity claims based on securities of the same class and series of an issuer is attributable to the debtor's non-compliance with the requirements of § 78o(c)(3) of this title and the rules prescribed under such section;

(B) resources provided through the use or realization of customers' debit cash balances and other customer-related debit items as defined by the Commission by rule;

(C) any cash or securities apportioned to customer property pursuant to § 78fff(d); and,

(D) any other property of the debtor which, upon compliance with applicable laws, rules, and regulations, would have been set aside or held for the benefit of customers, unless the trustee determines that including such property within the meaning of such term would not significantly increase customer property.

15 U.S.C. § 78lll(4). We conclude that the meaning of customer property appears plain on the face of § 78lll(4).

The Bankruptcy Code also defines customer property. Section 741(4) of Title 11 provides that

"customer property" means cash, security, or other property, and proceeds of such cash, security, or property, received, acquired, or held by or for the account of the debtor, from or for the securities account of a customer—

(A) including—

(i) property that was unlawfully converted from and that is the lawful property of the estate;

(ii) a security held as property of the debtor to the extent such security is necessary to meet a net equity claim of a customer based on a security of the same class and series of an issuer;

(iii) resources provided through the use or realization of a customer's debit cash balance or a debit item includible in the Formula for Determination of Reserve Requirement for Brokers and Dealers as promulgated by the [Securities and Exchange] Commission under the Securities Exchange Act of 1934 (15 U.S.C. 78a et seq.); and

(iv) other property of the debtor that any applicable law, rule, or regulation requires to be set aside or held for the benefit of a customer, unless including such property as customer property would not significantly increase customer property; but

(B) not including—

(i) a customer name security delivered to or reclaimed by a customer under section 751 of this title; or

(ii) property to the extent that a customer does not have a claim against the debtor based on such property . . .

The Bankruptcy Code's definition of customer property is, therefore, substantially the same as that under SIPA.

I. *Overage proceeds from the sale of excess collateral.*

■ We first decide whether overage proceeds from the sale of excess collateral constitute customer property within the meaning of § 78lll(4). Under § 78lll(4)(C), "any cash or securities apportioned to customer property pursuant to § 78fff(d)" is customer property. Section 78fff(d) provides that overage proceeds from the sale of excess collateral constitute customer property in proportion to the cash and securities customers contributed to the lien or pledge liquidated. Subsection (d) states, in pertinent part:

In a liquidation proceeding under this chapter, any cash or securities remaining after the liquidation of a lien or pledge made by a debtor shall be apportioned between his general estate and customer property *in the proportion in which the general property of the debtor and the cash and securities of the customers of*

*such debtor contributed to such lien or pledge.*

15 U.S.C. § 78fff(d) (emphasis ours).

According to the facts presented here, Security Pacific liquidated approximately $10.1 million in securities to satisfy DSC's outstanding obligations in the amount of $9,894,514. The liquidation resulted in overage proceeds amounting to $758,271. Under § 78fff(d), these proceeds constitute customer property in proportion to the cash and securities customers contributed to the lien or pledge liquidated. Fully paid customer property comprised 57% ($5,639,646 out of $9,894,514) of the securities liquidated. Applying the statutory language to these facts, we hold that 57% or $432,214 of the overage proceeds constitute customer property under § 78*lll*(4)(C).

### II. *Proceeds of customer securities.*

[2] We next direct our attention to whether proceeds of customer securities are customer property under § 78*lll*(4). Section 78*lll*(4) clearly states that customer property includes proceeds of property otherwise considered customer property under SIPA. Section 78*lll*(4) provides, in pertinent part:

> "customer property" means cash and securities (except customer name securities delivered to the customer) at any time received, acquired, or held by or for the account of a debtor from or for the securities accounts of a customer, *and the proceeds of any such property transferred by the debtor, including property unlawfully converted.*

(emphasis ours).

The issue here is not so much whether proceeds of customer securities are customer property within the meaning of SIPA, which they clearly are, but whether the proceeds of the liquidated firm assets constitute proceeds of the hypothecated fully paid customer securities. According to the facts of this case, DSC hypothecated to Security Pacific fully paid customer securities for purchase money loans. Security Pacific disbursed the proceeds of these loans not to DSC directly but to a seller of securities, with which DSC had contracted, upon delivery to DSC from that seller of the securities provided for in the contract. Although the hypothecated (and later liquidated) customer securities amounted to approximately $5,639,646, the proceeds from the sale of firm securities equals the $1,213,899 in dispute. We find that the firm securities liquidated in the amount of $1,213,899 were among those purchased with the Security Pacific loan. A significant amount of these securities remain unaccounted.

We hold that to the extent that hypothecation of fully paid customer securities beget firm securities, proceeds from the liquidation of the firm securities constitute the proceeds of the customer securities hypothecated and are, therefore, customer property under the "proceeds" provision of § 78*lll*(4). Thus, the proceeds of the fully paid customer securities hypothecated to Security Pacific, and the $1,213,899 from the liquidation of firm securities, are customer property within the meaning of § 78*lll*(4).

### III. *Other bank accounts excluding overage proceeds*

■ The third and final matter concerns whether cash, other than overage proceeds, constitutes customer property under SIPA. Specifically, we must decide whether $1,610,684 in DSC cash is customer property. Again, we turn to the relevant SIPA language.

Section 78*lll*(4)(D) states that customer property includes other property of the debtor that would have been set aside or held for the benefit of customers under applicable laws, rules and regulations. Under this section:

> The term customer property includes—
>
> (D) *any other property of the debtor which, upon compliance with applicable laws, rules and regulations, would have been set aside or held for the benefit of customers,* unless the trustee determines that including such property within the meaning of such term would

**390**

not significantly increase customer property.

15 U.S.C. § 78*lll*(4)(D) (emphasis ours).

According to Trustee, subsection (D) provides that "property of the debtor is property which, if it had been set aside for customers, would have put the debtor in compliance with the Customer Protection Rule." This interpretation not only belies the language of subsection (D), but also tortures it meaning. Subsection (D) includes as customer property not that property which, if it has been set aside for customers, would have put the debtor in compliance with applicable laws, rules and regulations, but rather that property that would have been set aside or held for the benefit of customers under applicable laws, rules and regulations. *See*, 4 *Collier on Bankruptcy* § 741.04, at 741–36.

■ Section 78*lll*(4)(D) includes in customer property "such property as *would* have been set aside or held for the benefit of customers *upon compliance* with applicable laws, rules and regulations." 4 *Collier on Bankruptcy* § 741.04, at 741–36 (emphasis ours). The following passage summarizes this point:

> While the Code makes only the actual contents of a special reserve bank account required to be maintained pursuant to applicable law for the benefit of customers a part of the fund of customer property, SIPA permits the trustee to look beyond the 15c3–3(e) Special Reserve Account to the debtor's other (i.e. non-customer) bank accounts to make up any deficiency in the Special Reserve Account. In other words, if the debtor miscalculated the funds to be set aside ... or otherwise under funded such account, the trustee can recoup any deficiency from "firm" property.

4 *Collier on Bankruptcy* § 741.04. at 741–36.

■ The applicable laws, rules and regulations under which this other property of the debtor would have been set aside include, principally, the Customer Protection Rule, 17 C.F.R. § 240.15c3–3, which the ·SEC promulgated as directed by ·SIPA. The Customer Protection Rule requires

broker-dealers to maintain possession or control of customers' fully paid and excess-margin securities. The Customer Protection Rule also regulates customer cash kept at broker-dealers for the purchase of securities, and requires that broker-dealers maintain a separate bank account specified as a reserve account. *See* General Accounting Office, *Securities Investor Protection: The Regulatory Framework Has Minimized SIPC's Losses* 26 (1992) (GAO/GGD–92–109).

According to § 78*lll*(4), cash other than overage proceeds may constitute customer property. Cash other than overage proceeds constitutes customer property to the extent of the $1.2 million deficiency. 11 U.S.C. § 78*lll*(4)(D). The facts show that DSC's customer reserve account carried a $1.2 million deficiency. Proceeds from customer securities, however, more than cover this amount. Cash other than overage proceeds therefore need not be tapped to satisfy the fund deficiency.

## CONCLUSION

Overage proceeds from the sale of excess collateral constitute customer property in proportion to the cash and securities customers contributed to the lien or pledge liquidated, which amount is $432,214. Proceeds from the sale of firm securities traceable to customer securities transferred by the debtor are customer property. Firm cash other than overage proceeds need not be assessed to satisfy the deficiency in the customer reserve account.

The parties shall settle an order on five days notice consistent with this Memorandum of Decision.