**In re ADLER, COLEMAN CLEARING CORP., Debtor.**

**Bankruptcy No. 95–08203 (JLG).**

United States Bankruptcy Court,
S.D. New York.

Jan. 22, 1998.

Cleary, Gottlieb, Steen & Hamilton, New York City, for the trustee.

Gusrae, Kaplan & Bruno, New York City, for Paul T. Russo.

Kittay Gold & Krebsbach, P.C., New York City, for Lek, Schoenau & Co., Inc.

*MEMORANDUM DECISION ON TRUSTEE'S MOTION FOR AN ORDER UPHOLDING DETERMINATIONS OF CLAIMS ASSERTED BY DUKE & CO., INC., LEK SCHOENAU & CO., INC., LYNCH JONES & RYAN, INC. AND SOUTH RICHMOND SECURITIES, INC., AND EXPUNGING OBJECTIONS TO THOSE DETERMINATIONS*

JAMES L. GARRITY, Jr., Bankruptcy Judge.

Edwin Mishkin, SIPA trustee (the "trustee") for the liquidation of Adler, Coleman Clearing Corp. ("Adler" or "debtor"), seeks an order upholding his denial of customer claims filed by Duke & Co., Inc. ("Duke"), Lek Schoenau & Co., Inc. ("LSC"), Lynch, Jones & Ryan, Inc. ("LJR") and South Richmond Securities, Inc. ("South Richmond"). LJR withdrew its opposition to the trustee's determination of its claim. Duke failed to respond to the motion and is deemed to accede to the trustee's determination of its claim. LSC and Paul T. Russo, as assignee of South Richmond's claim, oppose the motion. The Securities Investors Protection Corporation ("SIPC") supports it. We grant the motion.

### Facts

Except as noted otherwise, the relevant facts are not in dispute. On February 27, 1995 (the "Filing Date"), the Honorable Loretta A. Preska of the United States District Court for the Southern District of New York

entered an order pursuant to the § 5(b) of the Securities Investor Protection Act ("SIPA") appointing the trustee to liquidate debtor's business and removing the liquidation proceeding to this court. Debtor was a member of SIPC and a broker-dealer registered with the Securities and Exchange Commission ("SEC"). It acted primarily as a clearing firm serving approximately 42 introducing firms on a fully disclosed basis and handled approximately 66,000 active customer accounts. As of the Filing Date, those accounts were frozen and the customers could not trade in or otherwise have access to their accounts.

■■■ SIPA protects customers of registered broker-dealers who entrust those broker-dealers with cash or securities in the ordinary course of business. A person whose claim against the debtor qualifies as a "customer claim" receives preferential treatment in the distribution of assets from the debtor's estate. Claimants with valid customer claims share in the fund of "customer property" to the extent of their "net equity". The latter equals the difference between the amount the debtor would owe the customer were all the securities and cash balances valued as of the filing date, and the amount of any indebtedness of the customer to the debtor as of the filing date. A SIPA trustee distributes "customer property" exclusively among the debtor's customers, on a *pro rata* basis determined to the extent of each customer's net equity.

Under SIPA, the last day for Adler's former customers to file claims was September 22, 1995. By order dated March 10, 1995, we established a procedure for the trustee to review timely filed claims and to determine the portion, if any, meriting preferred customer claim status. The order directs the trustee, where appropriate, to calculate the customer's net equity and provide it with written notification thereof. It directs any customer who objects to the trustee's determination to do so in writing, in which case the trustee is required to schedule a hearing on the issues raised by the claimant.

## South Richmond

South Richmond was formerly an introducing broker that cleared trades through debtor pursuant to a Fully Disclosed Clearing Agreement (the "SR Clearing Agreement"). Pursuant to that agreement, debtor, as South Richmond's agent and on its instructions, agreed to carry the cash and margin accounts of the customers introduced by South Richmond and to clear and settle transactions on a fully disclosed basis for South Richmond's customer accounts. SR Clearing Agreement ¶¶ 1 and 3. In substance, South Richmond agreed to supervise the accounts of the customers it introduced to debtor and to indemnify debtor for, among other things, any and all losses, liabilities and expense suffered or incurred by debtor as a result of its clearing activities for South Richmond or its customer accounts. *Id.* ¶¶ 5–7. Debtor collected commissions on South Richmond's behalf by charging South Richmond's customers whatever amount South Richmond directed it to charge for a particular transaction. *Id.* ¶¶ 9(a) and 10(c). Debtor credited those commissions to an account maintained by South Richmond (the "SR Clearing Account") with debtor. *Id.* ¶ 9(b). South Richmond agreed to compensate debtor for its services at specified rates and to pay a minimum monthly fee even if it did not use debtor's services. *Id.* ¶¶ 10(a) and (b). It further agreed that debtor could collect its fees and/or monthly minimum directly from the SR Clearing Account, and that the account would secure payment of all of its obligations to debtor, whether they arose under the agreement or otherwise. *Id.* ¶¶ 9(b), 10(a), 10(b) and 18. The agreement authorized debtor to charge the SR Clearing Account for any unsecured debt or short position open for 30 days in South Richmond's trading account or one of its customer's accounts. *Id.* ¶ 11. It also enabled debtor to recover any unresolved claims it had against South Richmond and to deduct any losses or expenses for which it was entitled to be indemnified directly from that account. *Id.* ¶ 8(b). The agreement directs debtor to recover its losses from the SR Clearing Account in the first instance, after which debtor could look to a separate deposit

account for payment of any amounts due. *Id.* ¶ 8(a) and (b).

South Richmond ceased doing business in December of 1994. On or about January 24, 1995, it filed a Form Broker Dealer Withdrawal with the SEC and the National Association of Securities Dealers ("NASD"). On or about December 20, 1994, South Richmond agreed to transfer its assets, including its customer accounts, to Rickel & Associates, Inc. On or about February 24, 1995, Russo allegedly met with Edward Cohan, debtor's Chairman, and allegedly advised him that because South Richmond had withdrawn its broker-dealer status, it was no longer a broker-dealer. According to Russo, Cohan stated that debtor was treating the SR Clearing Account as a customer account that had been restricted as to further business. Russo allegedly asked Cohan to close the account and issue South Richmond a check in the amount of $53,607.61, or the total value of the account. Debtor gave Russo a check made payable to him in that amount, which he deposited four days later. On March 3, 1995, Russo learned that debtor had stopped payment on the check. On or about April 12, 1995, South Richmond assigned its claim against debtor to Russo. Thereafter, Russo, as South Richmond's assignee, filed a customer claim for $56,532.14.

### *Lek Schoenau & Co.*

As of the Filing Date, LSC was a member of the New York Stock Exchange ("NYSE") and the American Stock Exchange ("AMEX") and was registered as a broker/dealer with the SEC. On or about May 17, 1994, LSC executed a Clearing Agreement with debtor (the "LSC Clearing Agreement"). It is identical to the SR Clearing Agreement, with certain exceptions that we will discuss below.

LSC has developed specialized software for executing orders on behalf of its clients through the NYSE and AMEX electronic routing systems. To assist in processing those orders, Adler maintained separate proprietary trading accounts for LSC, each identified with a sub-title corresponding to the name of the clearing firm where LSC's client maintained its account. For example, it had proprietary accounts at Adler entitled "House Account Lek, Schoenau & Co., Inc./Bear Stearns" and "House Account Lek, Schoenau & Co., Inc./Spear, Leeds & Kellog". According to LSC, the funds held in those accounts represented the net amount of mark-ups or mark-downs, as opposed to commissions, realized from securities transactions with its customers.

Once a month, Adler would transfer the funds from the various proprietary trading accounts to a single proprietary trading account entitled "Lek, Schoenau & Co., Inc./House Account" (the "LSC House Account"). As of the Filing Date, LSC had cash deficits in two of its proprietary accounts aggregating $1,082.72, and a credit balance in its house account totaling $43,535.24. LSC timely filed a $42,452.52 customer claim to recover the funds on deposit in the LSC House Account as of the Filing Date.

### *The Trustee's Determination*

After reviewing both claims, the trustee refused to accord either claim preferred custom claim status and advised Russo and LSC of his determination to allow South Richmond and LSC general creditor claims totaling $63,367.16 and $43,535.24, respectively. LSC and Russo timely contested the trustee's determinations. The trustee now seeks an order upholding them.

### *Discussion*

We base our subject matter jurisdiction of this proceeding on 15 U.S.C. §§ 78eee(b)(2)(A) and (b)(4) and the district court order dated February 27, 1995 referring and removing debtor's case to this court. This motion is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A).

■ To prevail herein, LSC and Russo must prove that they are "customers" and that the equity in their accounts is "customer property" under SIPA. *See Jackman v. SIPC (In re Brentwood Secs., Inc.),* 96 B.R. 1002, 1006–07 (9th Cir. BAP 1989); *In re Adler, Coleman Clearing Corp.,* 204 B.R. 111, 115 (Bankr.S.D.N.Y.1997); *SIPC v. C.J. Wright & Co., Inc. (In re C.J. Wright & Co., Inc.),* 162 B.R. 597, 605 (Bankr.M.D.Fla.

1993). Under SIPA, the term "customer" means

> any person (including any person with whom the debtor deals as principal or agent) who has a claim on account of securities received, acquired, or held by the debtor in the ordinary course of its business as a broker or dealer from or for the securities accounts of such person for safekeeping, with a view to sale, to cover consummated sales, pursuant to purchases, as collateral security, or for purposes of effecting transfer. The term "customer" includes any person who has a claim against the debtor arising out of sales or conversions of such securities, and any person who has deposited cash with the debtor for the purpose of purchasing securities....

15 U.S.C. § 78*lll*(2). The term "customer property" means

> cash and securities (except customer name securities delivered to the customer) at any time received, acquired or held by or for the account of a debtor from or for the securities accounts of a customer, and the proceeds of any property transferred by the debtor, including property unlawfully converted....

15 U.S.C. § 78*lll*(4).

The trustee asserts that Russo and LSC are not "customers" under SIPA because (a) debtor did not hold the assets contained in the LSC House Account and the SR Clearing Account in the ordinary course of business as a broker-dealer but in its clearing capacity, (b) the cash in those accounts was not deposited for the purpose of purchasing securities but for collection purposes and as collateral for the clearing obligations, and (c) the funds in those accounts are not proceeds from the sale of securities or from the unlawful conversion of securities.

### South Richmond/Russo

As a preliminary matter, Russo does not concede that the SR Clearing Account contained commissions collected by Adler for South Richmond's benefit. He argues that the account contained liquidated assets generated from the sale of securities by Adler for South Richmond. Thus, he maintains that the account contained "customer proper-

ty" under SIPA and that his claim is entitled to preferred SIPA status.

■ However, Russo has not met his burden of proving that the account contained customer property. The undisputed evidence shows that, in contrast to its other proprietary accounts, South Richmond never used the SR Clearing Account to buy or sell securities. Declaration of Richard M. Winn, dated April 9, 1997 ¶ 2. Rather, the evidence proves that Adler credited that account with commissions and other fees it agreed to charge customers on South Richmond's behalf, deducting its own fees and deducting amounts owing from various customer accounts. *Id.* Adler continued to post commissions to and deduct fees from the SR Clearing Account after South Richmond withdrew as a broker-dealer. *Id.* The trustee also posted commissions to this account for trades occurring just prior to the Filing Date and for which commissions had not been credited. *Id.* Those additional postings account for the difference between the amount Russo claimed ($56,532.16) and the actual balance in the account ($65,913.66). Thus, we find that the account contained commissions and not SIPA customer property as Russo contends.

■ Russo also contends that when South Richmond ceased doing business as a broker-dealer and thereafter formally withdrew its broker-dealer status with the NASD and SEC, it became Adler's "customer". He relies in part on Cohan's purported agreement to treat the SR Clearing Account as a "customer" account restricted as to any further business. We reject Russo's argument. The fact that debtor and Russo may have agreed to treat the account as a "customer" account does not give South Richmond or Russo preferred status herein. Under SIPA, the term "customer" is not used in the colloquial sense of one who buys or trades. *In re Adler, Coleman,* 204 B.R. at 115 (quoting *SIPC v. Wise (In re Stalvey and Associates, Inc.),* 750 F.2d 464, 468 (5th Cir.1985)). The term refers to those who entrust cash or securities to broker-dealers for the purpose of trading and investing in the securities market. *SIPC v. Morgan, Kennedy & Co.,*

533 F.2d 1314, 1317 (2d Cir.) ("[e]mphasis on the customer as investor and purchaser/trader has been a consistent theme in cases in this Circuit") (citing cases), *cert. denied,* 426 U.S. 936, 96 S.Ct. 2650, 49 L.Ed.2d 387 (1976); *SEC v. F.O. Baroff Co., Inc.,* 497 F.2d 280, 282 (2d Cir.1974) ("[t]he emphasis throughout [SIPA's legislative history] was on the customer as investor and trader, not on others who might become creditors of the broker-dealer for independent reasons"); *accord SIPC v. Executive Secs. Corp.,* 556 F.2d 98, 99 (2d Cir.1977); *In re John Muir & Co.,* 51 B.R. 150 (Bankr.S.D.N.Y.1985); *In re Hanover Square Securities,* 55 B.R. 235, 238 (Bankr.S.D.N.Y.1985). Thus, in determining "customer" status, we look to whether a particular transaction giving rise to a SIPA claim arose out of the type of fiduciary relationship generally characterizing the relationship between a broker-dealer and its customer. *See, e.g., Appleton v. First Nat'l Bank of Ohio,* 62 F.3d 791, 801 (6th Cir.1995) ("[t]he critical aspect of the 'customer' definition is the entrustment of cash or securities to the broker-dealer for the purposes of trading securities. Such a would-be investor has a fiduciary relationship with the broker-dealer, and is entitled to the protection of [SIPA]") (citations omitted); *see also Section by Section Explanation of H.R. 8331 Amendments to Securities Investor Protection Act: Hearing before the Subcomm. on Securities of the Senate Comm. on Banking, Housing and Urban Affairs,* 95th Cong., 2d Sess. 40–41 (1978) (noting that "[t]he definition of 'customer' should include only a person who enjoys the type of fiduciary relationship with the debtor that characterizes customers in general"). A claimant must do more than meet the definition of a "customer" to be entitled to preferred SIPA status. *See Baroff,* 497 F.2d at 282–83 (claimant fitting lit-

eral definition of customer not accorded SIPA protection because it did not entrust assets to broker-dealer for purpose of trading); *SIPC v. Executive Securities Corp.,* 556 F.2d at 99 (rejecting literal application of SIPA definition of customer to claimant who loaned securities to broker-dealer in return for cash collateral equal to market value of shares whereby each party retained right to demand additional cash if market value fluctuated); *In re SSIW Corp.,* 7 B.R. 735, 739–40 (Bankr.S.D.N.Y.1980) (claimant not afforded SIPA protection because it did not entrust money to broker-dealer in connection with a securities transaction; rather claimant held unexecuted "put" options granted by debtor).

South Richmond did not entrust the assets in the SR Clearing Account to debtor for the purpose of buying or selling securities. The SR Clearing Agreement gave rise to a debtor-creditor relationship between Adler and South Richmond as to the commissions. It did not create a fiduciary relationship among the parties. *See, e.g., Adler, Coleman,* 204 B.R. at 118; *Hanover Square,* 55 B.R. at 240.

We reject Russo's argument that the SR Clearing Account was somehow transformed into a customer account when South Richmond ceased acting as a broker-dealer. The fact that South Richmond ceased operating as a broker-dealer did not automatically terminate the SR Clearing Agreement. *See* SR Clearing Agreement ¶ 16.[1] There is no direct evidence that Adler formally terminated the SR Clearing Agreement. However, even assuming, *arguendo,* that it did, under paragraphs 16(g) and 18, the parties' respective rights and obligations under the agreement survived its termination. *See* SR Clearing Agreement ¶¶ 16(g) and 18.[2]

---

1. Paragraph 16(g) of the SR Clearing Agreement provides as follows:

   Termination of this Agreement however caused shall not release any party from any liability or responsibility to the other party with respect to transactions effected prior to the effective date of such termination whether or not claims relating to such transactions shall have been made before or after such termination.

2. Paragraph 18 of the SR Clearing Agreement provides as follows:

   The Introducing Firm hereby grants to the Clearing Agent a continuing security interest in and pledge of ... any and all ... property of the Introducing Firm ... on deposit [at Adler],.... Such security interest and pledge shall survive the termination of this Agreement and shall continue until all obligations of the Introducing Firm to [Adler] have been fully and finally settled.

Russo argues that he has a customer claim for the $53,607.61 contained in the SR Clearing Account because South Richmond assigned the assets in that account to him and, pursuant to an alleged prepetition oral agreement between Russo and Adler, agreed that the account was to be a private account which Russo could consider to be his personal account for trading purposes. Russo contends that, after it was assigned to him, the purpose of the SR Clearing Account was to hold the $53,607.61 in "safekeeping" for his benefit within the meaning of 15 U.S.C. § 78*lll*(2) (defining customer). He claims that he reached this agreement at a meeting at Adler's offices on February 24, 1995:

> During this meeting, I informed Cohan [CEO of Adler] that because [South Richmond] had withdrawn its broker-dealer status as of January, 1995 it was no longer a broker-dealer. Cohan then stated to me that [South Richmond's] private account was in fact being treated as a customer account of Adler's and had been designated "restricted" as to any further business....
>
> In addition, at this February 24th meeting, I once again informed Cohan that since [South Richmond] was no longer a broker-dealer, and was thus a customer of Adler, I requested that Adler close out the account and issue to me a check in the amount of $53,607.61, which represented the total value of [South Richmond's] customer account with Adler. I was given this check, made payable to "Paul Russo" in the amount of $53,607.61....
>
> On February 28, 1995, I deposited said check in my Chemical Bank account. I was notified by Chemical Bank on March 3, 1995 that Adler had stopped payment on the check.

Affidavit of Paul T. Russo, sworn to April 3, 1997 ¶¶ 9–11. Russo asserts that the trustee "stands in the shoes of" Adler and must honor this understanding. He contends that the CEO of Adler would never have issued the check if the money were needed to satisfy an outstanding obligation of South Richmond to Adler.

There is no evidence that the SR Clearing Account ever was a personal customer ac-

count rather than a restricted commission account. The document setting forth the restriction on the account lists the account as being in South Richmond's name, not Russo's. Thus, we conclude that the assets in the SR Clearing Account were not in "safekeeping" for Russo as that term is used in 15 U.S.C. § 78*lll*(2). "Safekeeping" is a term of art. "In brokerage houses, 'safekeeping' securities are those that are fully paid for and held in custody for the broker." *Stalvey*, 750 F.2d at 471–72 (citing H.R.Rep. No. 1613, 91st Cong., 2d Sess. 2 (1970); reprinted in 1970 U.S.C.C.A.N. 5254, 5256). The SR Clearing Account contains cash, not securities, and there is no evidence that the account was held in custody for Russo.

Moreover, Russo mischaracterizes the assignment agreement executed by South Richmond. That agreement explicitly states in relevant part that "[South Richmond] hereby agrees to sell and assign to [Russo] ... [South Richmond's] claim in [Adler's SIPA case]." It does not confer upon Russo any greater rights with respect to the SR Clearing Account than South Richmond had at the time of the assignment.

According to Russo, if the trustee is correct that Russo simply assumed South Richmond's claim, debtor should have demanded $153,000 from South Richmond instead of sending a check to Russo for the $53,000 credit because South Richmond was indebted to the debtor. Russo confuses the pre-Filing Date actions of Adler's principals with the actions and legal status of the trustee, who was enforcing SIPA. Moreover, the fact that an officer of Adler may have agreed that the SR Clearing Account would be treated as a restricted "customer" account by Adler does not mean that the account qualifies as such under SIPA as a matter of law.

### Lek Schoenau & Co.

When it executed the LSC Clearing Agreement, LSC was not a member of the NASD, and there is no dispute that only NASD members can act as introducing brokers. Accordingly, at the time that it executed the agreement, LSC deleted, among other things, those portions of the agreement stating that it was a member of the NASD.

Further, in the May 17, 1994 cover letter accompanying the executed LSC Clearing Agreement, Samuel F. Lek, LSC's Chief Executive Officer, stated as follows:

> Enclosed please find a duly executed copy of your Clearing Agreement. Please be advised that many of the provisions in the Agreement do not apply to [LSC]. Most importantly, you should be aware of the fact that LSC is not a member of the NASD and that we do not do business with customers who are not themselves SEC registered broker/dealers and members of the NASD and/or a National Securities Exchange. Accordingly, until further written notice, LSC will not introduce public customer business to Adler, Coleman and we do not carry a blanket broker bond. All introduced *public* business originating from this office will be formally introduced by Ash & Co., Incorporated, subject to appropriate procedures.
>
> We anticipate that most of the business executed by LSC and cleared by yourselves will be "flipped" to other clearing firms. LSC cannot accept the responsibilities of the "Introducing Broker" if an account is carried by Adler, Coleman due to the recommendation of your services by LSC.

(emphasis in original).

LSC contends that it traded exclusively for its own account and had a trading relationship with debtor like any other trading customer—that is, LSC purchased securities for its own account and later sold them, at a mark-up, to clients who maintained their accounts at other clearing firms. LSC compares and contrasts a "typical" scenario under a clearing agreement with that existing under the LSC Clearing Agreement as follows:

> The typical scenario contemplated by the Clearing Agreement is a three-way relationship. An introducing broker would introduce an account to the clearing firm. The account would have a trading and/or investing relationship with the clearing firm and accordingly be a customer as that term is defined in [SIPA]. The introducing broker itself, however, would in this scenario not have a trading/investing relationship with the clearing firm. The clearing firm would simply pay certain commissions to the introducing broker based on the trading activities of the introduced customer account.
>
> LSC's and Adler's relationship was, in contrast, a two-way relationship. There is no introduced account. Lek itself was the trading customer of Adler and the relationship was characteristic of the typical broker-customer relationship which SIPA was intended to protect.

Affidavit of Samuel F. Lek, sworn to April 3, 1997 ¶¶ 7 and 8. Thus, LSC denies that the LSC House Account contained commissions. It asserts that the account contains proceeds of trades effected for its own account, similar to the trading profits from transactions in over-the-counter securities, which have been found to qualify for customer treatment when held in proprietary accounts. According to LSC, the funds in the LSC House Account "ar[ose] out of sales ... of such securities" under 15 U.S.C. § 78*lll*(2) because they were proceeds of securities held by the debtor in another "customer account". LSC points to the fact that we found, by order dated March 6, 1995, that LSC was a customer with respect to securities in its proprietary trading accounts. It argues that we must find that it is a customer with respect to the cash in the LSC House Account because the assets in that account are derived from transactions in the proprietary trading accounts. Thus, LSC contends that it is a "customer" and the assets in the LSC House Account are "customer property" as defined in SIPA and § 741 of the Bankruptcy Code.[3]

---

**3.** Section 741(4) of the Bankruptcy Code defines "customer property" as:

cash, security, or other property, and proceeds of such cash, security, or property, received, acquired, or held by or for the account of the debtor, from or for the securities account of a customer ...

11 U.S.C. § 741(4). Section 741(4) is not applicable to SIPA liquidations because it is contained in subchapter III of chapter 7. *See* 15 U.S.C. § 78fff(b) (providing that "a liquidation proceeding shall be conducted in accordance with, and as though it were being conducted under chapters 1, 3, and 5 and subchapters I and II of

To further this argument, LSC contends that the funds in the LSC House Account are not commissions because they were not "deposited by the Debtor as payment for some type of service provided by [LSC] to the [debtor]." According to LSC, because it did not act as an introducing broker, the terms of the LSC Clearing Agreement do not define its relationship with Adler. Relying on the May 17, 1994 letter accompanying the executed and partially redacted LSC Clearing Agreement, LSC asserts that the LSC Account simply contains proprietary funds derived from the sale of customer securities which were transferred from other proprietary accounts for administrative convenience to allow Mr. Lek to draw on the profits from his trading.

■ Any modification to the LSC Clearing Agreement must be signed by the party against whom it is to be enforced. *See* LSC Clearing Agreement ¶ 23. Only Lek signed the May 17 letter. However, the evidence indicates that Adler never objected to LSC's unilateral modification of the terms of the clearing agreement, and dealt with LSC from May of 1994 through February of 1995 without requiring LSC to comply with any of the provisions of the original agreement that had been deleted by LSC at the time it executed it. Even assuming, *arguendo*, that the May 17 letter modified and became a part of the LSC Clearing Agreement, whether or not LSC was an introducing broker is irrelevant in determining whether it was a customer, or whether the assets in the LSC House Account are "customer property" under SIPA. *Adler Coleman*, 204 B.R. at 115 ("[b]y design, SIPA focuses on the specific securities or transactions that are the subject of a claim"); *Stalvey*, 750 F.2d at 471 (SIPA "designed relief predicated upon the specific securities or transactions for which a claim is made").

■ It is clear that the funds in the LSC House Account, which were derived from mark-ups or mark-downs on LSC's transactions, represent compensation to LSC by its customers for services Lek rendered in executing their orders. A sales representative of a broker-dealer may accept an order from a customer for the purchase or sale of a security and satisfy the order by selling the customer that security from the firm's own inventory or by purchasing the security from the customer for the firm's own account. In this situation, the firm is functioning as a dealer. When acting in this capacity, the firm does not charge a commission. It profits if it subsequently resells a security in its inventory to a customer at a higher price than it originally paid to obtain the security for its own account. When the resale results in a profit, the difference between the resale price and the firm's original cost is referred to as the "spread" or "mark-up". Patricia A. O'Hara, *The Elusive Concept of Control in Churning Claims under Federal Securities and Commodities Law*, 75 GEO.L.REV. 1875, 1936 n. 2 (Aug. 1987) (citing 5B A. JACOBS, LITIGATION AND PRACTICE UNDER RULE 10B–5 § 210.02, at 9–5–6 (2d rev. ed.1986)). Thus, the term "mark-up" means the difference between the amount of money a customer pays a dealer for a security and the prevailing market price of the security. *See* SECURITIES AND EXCHANGE COMM'N, REPORT OF SPECIAL STUDY OF SECURITIES MARKETS, H.R. DOC. NO. 95, 88th Cong., 1st Sess. 611 (1963) (hereinafter "REPORT OF SPECIAL STUDY"). The term "mark-down" means the difference between the purchase price to the customer and the prevailing market price on the buy side of the market. *See* O'Hara at p. 1936; *see also In re E.F. Hutton & Co., Inc.*, Sec.Ex. Act Rel. No. 25887 (July 6, 1988), 41 SEC Docket 413, 423 (dissenting opinion of J. Grundfest) ("[t]he spread between 'bid' and 'asked' prices is a source of compensation for market makers who bear the risk and capital costs of maintaining inventory in securities"); *First Independence Grp., Inc. v. SEC*, 37 F.3d 30, 32 (2d Cir. 1994) ("[w]hen a securities firm acts as a dealer, it is entitled to charge a reasonable markup on the wholesale price it pays for the securities"). A mark-up compensates a dealer for its ordinary costs and risks associated

chapter 7 of title 11"). Nevertheless, its definition of "customer property" closely parallels that

set forth in § 78*lll*(2). *See* 6 COLLIER ON BANKRUPTCY ¶ 741.05[1] at 741–14 (15th ed. rev.1997).

with handling retail transactions. REPORT OF SPECIAL STUDY at p. 673.

LSC relies on *Horwitz v. Sheldon (In re Donald Sheldon & Co., Inc.)*, 148 B.R. 385 (Bankr.S.D.N.Y.1992), wherein the court addressed the issue of whether overage proceeds of customer securities hypothecated by a broker-dealer were "customer property" under 15 U.S.C. § 78*lll*(4). The debtor had hypothecated customer securities to Security Pacific for purchase-money loans. To satisfy the debtor's obligations to it, Security Pacific disbursed those securities to a third party contracted by the debtor. Security Pacific liquidated approximately $10.1 million in securities to satisfy debtor's obligations of $9,894,514, resulting in overage proceeds of approximately $758,271. *Id.* at 387. A portion of the securities liquidated represented fully-paid customer securities and the rest represented firm securities. The proceeds of the hypothecated fully-paid customer securities totaled $5,639,646 and the proceeds from the sale of the firm securities totaled $1,213,-899. *Id.* SIPC filed a petition commencing a SIPA liquidation against the debtor. The trustee commenced an adversary proceeding to recover money and property of the debtor's estate alleging that it was lost as a result of the defendants' breach of duty. *Id.* at 387. Following a trial, the jury returned a verdict against the defendants. In adjudicating the measure of damages, the court addressed whether the overage proceeds from the sale of Security Pacific's excess collateral, among other things, constituted "customer property" under 15 U.S.C. § 78*lll*(4)(C). *Id.* at 386. The court found that they were. The court reasoned that under 15 U.S.C. § 78*lll*(4)(C), "any cash or securities apportioned to customer property pursuant to § 78fff(d)" is customer property, and that § 78fff(d) provided that overage proceeds from the sale of excess collateral constitute customer property in proportion to the cash and securities customers contributed to the lien or pledge liquidated. *Id.* at 388. Applying this statute, the court found that the overage proceeds of $5,639,646, which resulted from the sale of the fully paid customer securities, constituted customer property under § 78*lll*(4)(C). *Id.*

Next, the court addressed whether the proceeds of the firm securities were customer property under § 78*lll*(4). *Id.* at 389. The court noted that proceeds of customer securities are clearly customer property within the meaning of § 78*lll*(4). *Id.* However, the issue was whether the proceeds of liquidated firm assets constituted proceeds of the hypothecated fully-paid customer securities. Since the debtor had hypothecated fully-paid customer securities to Security Pacific for purchase money loans and Security Pacific had disbursed the proceeds of those loans to a seller of securities upon the seller's delivery to the debtor of the securities provided for in its contract, the court found that the $1,213,899 in proceeds of firm securities were traceable to the hypothecated liquidated customer securities. *Id.*

LSC's misplaces its reliance on *Donald Sheldon* because the LSC House Account contains sums arising from mark-ups and mark-downs realized from trades effected through debtor, not money received in exchange for the sale of those securities. Section 78*lll*(4)'s definition of customer property refers to the proceeds from the liquidation of customer securities, not the profits from trading activity. *See In re Waddell Jenmar Secs., Inc.*, 126 B.R. 935, 942 (Bankr. E.D.N.C.1991) (granting customer claim for misappropriated proceeds from sale of customer's securities), *aff'd*, 991 F.2d 792 (4th Cir.1993). In addition, customer status with respect to LSC's proprietary trading accounts does not confer "customer" status on all of its accounts. *See Stalvey*, 750 F.2d at 471 (customer status with respect to one account does not confer customer status on other accounts); *F.O. Baroff*, 497 F.2d at 282 n. 2 (same); *Adler, Coleman*, 204 B.R. at 115–16 (same).

LSC attempts to distinguish *Stalvey, Baroff,* and *Adler Coleman* on the ground that these cases did not concern a claim for customer property based on the proceeds of trading activity. It further argues that the LSC House Account is different from the deposit account at issue in *Adler Coleman* because the LSC House Account, unlike the deposit account in that case, is not mandated under the Clearing Agreement, and LSC

could have requested Adler to wire out its trading profits on a daily basis. These are immaterial distinctions. As in those cases, the LSC House Account is not a customer account because LSC is not a customer. It did not set up the account to engage in trading activity, the assets contained therein were not held in the ordinary course of debtor's business as a broker dealer and, although technically, the cash in the account was the "proceeds" of securities transactions involving a customer account, the assets in the LSC House Account do not come within the ambit of the statute.

■■■■■ LSC also argues that it should be afforded preferred status because over-the-counter securities dealers were given 66% of the net equity of their trading accounts, which included trading profits. According to LSC, if it did not open the LSC House Account and had instead kept the profits of its trading activity in its proprietary accounts, it too would have received 66% of the net equity thereof. The trustee does not dispute that LSC would have received 66% of its net equity had its proprietary trading accounts contained any assets. However, they did not. Moreover, unlike the OTC brokers' accounts, LSC has not shown that there were any assets other than commissions in the LSC House Account. In essence, LSC argues that it is inequitable to deny LSC's customer claim for assets held in its house account simply because they were not kept in the proprietary trading accounts. However, this is not a case where a claimant is denied preferred status because the debtor simply neglected to open a customer account. *See, e.g., SEC v. Ambassador Church Finance/Development Group, Inc.*, 679 F.2d 608 (6th Cir.1982) ("[i]t is not likely that Congress, in seeking to protect the assets of small transaction customers of broker-dealers, intended to make eligibility for protection depend on whether the broker complied with the rules of the SEC or practices of the

trade.... The trusting customer is not to be penalized for choosing a careless, unethical or dishonest broker"). The arrangement whereby LSC's brokerage commissions were to be kept in a separate account was fully contemplated by LSC when it signed the LSC Clearing Agreement. For this reason, LSC's equitable argument must fail:

> [A]rguments based solely on the equities are not, standing alone, persuasive. If equity were the criterion, most customers and creditors of ... the bankrupt, would be entitled to reimbursement for their losses.... SIPA was not designed to provide full protection to all victims of a brokerage collapse....

*Packer, Wilbur*, 498 F.2d at 983.

In addition, LSC argues that pursuant to 17 C.F.R. 300.101, all of LSC's accounts "shall be combined so as to constitute a single account of a separate customer." That section states as follows:

> (a) Except as otherwise provided in these rules, all accounts held with a member by a person in his own name, and those which under these rules are deemed his individual accounts, shall be combined so as to constitute a single account of a separate customer.
>
> (b) An account held with a member by an agent or nominee for another person as a principal or beneficial owner shall, except as otherwise provided in these rules, be deemed to be an individual account of such principal or beneficial owner.

17 C.F.R. § 300.101.

This section applies to claimants who already qualify as customers. Moreover, it has no bearing on whether LSC has a preferred customer claim with respect to a particular account. Rather, the Series 100 Rules, 17 C.F.R. §§ 300.100–300–105 (1996), address which accounts held by a customer should be considered as one account for purposes of determining net equity and obtaining SIPC advances.[4]

---

4. SIPC Rule 100 provides as follows:

(a) For the purpose of sections 9(a)(2) and 16(11) of the Securities Investor Protection Act ..., these rules will be applied in determining what accounts held by a person with a member

of SIPC ... are to be deemed accounts held in a capacity other than his individual capacity. (b) Accounts held by a customer in different capacities, as specified by these rules, shall be accounts of "separate" customers.

17 C.F.R. § 300.100.

## Conclusion

We grant the trustee's motion upholding his determinations with respect to the claims filed by Russo, as assignee of South Richmond, LSC, LJR and Duke.

SETTLE ORDER.